**UNITED STATES of America, Plaintiff,**

**v.**

**Jose ABREU, Defendants.**

**Civ. A. No. 89–CR–316.**

United States District Court, D. Colorado.

Feb. 6, 1990.

---

Michael P. Carey, Katherine Meyer, Asst. U.S. Attys., Denver, Colo., for plaintiff.

Michael L. Bender, Stephanie B. Boyer, Bender & Treece, P.C., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

The defendant, Jose Abreu (Abreu), filed a motion to suppress evidence seized at the Loma, Colorado port of entry, statements made over the telephone just prior to his arrest and thereafter, and the fruits of his arrest and search of his New York apartment. Abreu also seeks return of an automobile seized by DEA agents on his arrest. For the reasons stated hereafter, I deny the motions.

### I. Findings of Fact.

The Colorado Department of Revenue has established eleven fixed weigh and check points. The port of entry at I–70 in Loma, Colorado is located about 15 miles east of the Colorado–Utah border on I–70. The port of entry handles all east-west commercial vehicles with a gross empty vehicle weight of 10,000 lbs. or greater or vehicles transporting hazardous materials. It is open 24 hours a day to eastbound traffic and during the daytime hours only to westbound traffic. Approximately 600 vehicles enter the port daily. The vehicles

are inspected for safety and hazardous materials and to assess and collect taxes. The officers usually perform 8–10 inspections per day and the inspections normally last from 30 to 60 minutes.

As part of the safety inspection, port of entry officers are instructed to look for a color-coded safety inspection sticker which commercial vehicles are required by the North American Commercial Safety Alliance to obtain quarterly and display in the lower right windshield. For purposes of tax assessment, some commercial vehicles obtain a prorated plate which allows them to pay taxes in their home state. The home state then pays a portion of the tax to the other states through which the commercial vehicle travels. Other commercial vehicles pay tax on a trip by trip basis. If the port of entry officer does not see the pro-rated plate, he must weigh and inspect the truck in order to assess taxes.

Vehicles without current inspection stickers are moved into the scale lane. The vehicles are driven onto the scale and weighed across each axle. The driver speaks through a speaker atop a pole. Once the vehicle is weighed it is moved into the inspection lane for inspection.

On Friday, September 8, 1989 at about 1:30 p.m., a blue tractor with an attached silver trailer pulled into the Loma port of entry for eastbound traffic. Colorado Department of Revenue Officer, Motor Carrier Safety Inspector, Kevin Edens (Edens), was on duty and available to conduct an inspection of the vehicle. Edens' duties include the inspection of commercial vehicles for safety, the inspection of cargo for proper load-locking and hazardous materials, and the assessment and collection of tax revenue.

The tractor was a 1985 Kenworth with New Jersey license plate number XS98AL and a vehicle identification (VIN) number 405117BR3JM0008211. The trailer was a 1979 Dorsey with a VIN number 13186. The license plate on the trailer was New Jersey license plate number T388FL, which was registered to a different trailer, a 1984 Dorsey with a VIN number 44339. The tractor had no current vehicle safety in-

spection sticker in the lower right windshield as required by the North American Commercial Safety Alliance. The tractor-trailer was weighed and the driver, Escano, advised the weighmaster that the trailer was empty. The weight was determined to be 39,000 pounds or approximately 4,000 pounds over empty weight for this particular rig.

The tractor-trailer then was moved into the safety inspection lane. The inspection yard at the Loma Port of Entry is from 130 to 150 feet from the main building and is encircled by a fence. Edens approached Escano and told him that he was conducting a safety inspection of the vehicle and requested that Escano produce his driver's license, medical card, log book, and tax stamps. Escano initially produced only a driver's license application and a learner's permit which showed him to be 19 years old, under the 21 year minimum age required for the interstate transportation of cargo. Edens then spoke to the only passenger in the tractor-trailer, Brito, and discovered that he had a New York State commercial vehicle driver's license, but also was under age for the interstate transportation of cargo. Edens completed a violation sheet, citing Escano for not having a valid driver's license and asked Escano and Brito to accompany him to the port of entry building to get their tax permit started and to obtain a cash clearance.

Edens then asked Escano where they were coming from, their destination, and the contents of the trailer to compute and assess the mileage tax. Escano replied that they came from Salt Lake City and that the trailer was empty. Escano told Edens that they were enroute to New York City. Edens testified that this was not the most direct route for truckers. Edens asked if they were going to pick up anything and Escano said no. Escano told Edens that he and Brito had flown from New York to Salt Lake City because their truck had broken down in an empty parking lot and they were returning it to New York.

On their way to the port of entry building, Edens asked Escano and Brito to re-

trieve the registration from the tractor-trailer to compute taxes. Edens went alone into the port of entry building where he told his supervisor that he had a suspicious contact and to "watch his back."

When Edens returned to the truck, Escano told him that they did not have the trailer's vehicle registration documents. Escano did have a vehicle registration for the tractor showing defendant Jose Abreu (Abreu) to be the owner. Escano also had a resident alien card which he gave to Edens. Edens again asked Escano if the truck was empty and Escano replied yes. Edens noticed that the trailer was padlocked and asked Escano to open it. Escano did not object. He retrieved the key from the cab and opened the padlock to the trailer doors.

Edens looked inside and saw wooden pallets in the front of the trailer. The pallets were secured with two load locks. Edens climbed into the trailer and saw cardboard between the pallets. He asked Escano what it was and Escano replied that he did not know. Escano helped Edens move the pallets and Edens saw that there was a row of taped cardboard U–Haul boxes underneath the pallets. There were no placards for the cargo and nothing to indicate specifically that the cargo contained hazardous materials. However, Edens did not see any leaks, fumes, or clouds, or smell any odors.

Edens testified credibly. He stated that he had no idea what was in the boxes, but that he was suspicious. Edens testified that it was his custom to physically examine load-locking bars securing cargo, that it was unusual for cargo to rest on the floor of a trailer with pallets riding on top and in front of the cargo rather than the cargo riding on top of the pallets, and that in his considerable experience he had never before encountered two underage drivers operating an interstate commercial vehicle. Edens left the trailer, took his supervisor to one side, and asked him to call the Colorado State Patrol.

Colorado State Patrol Trooper Andrew Murin (Murin) arrived at the port of entry within 5 to 10 minutes. Escano and Brito were inside the port of entry building. Edens met Murin outside and told Murin that he had two underage drivers who did not have the required medical cards or log book with undeclared freight in the trailer, and a registration card for the tractor but none for the trailer. Edens gave Murin Escano's resident alien card and the other documents. Murin went into the port of entry building and arrested Escano and Brito for the interstate transportation of cargo while under age and handcuffed them.

Murin and Edens then went out to the tractor-trailer. The trailer doors were open. Murin climbed into the trailer and looked at the U–Haul boxes under the pallets and pulled one out. Murin testified credibly. He stated that he was not conducting an inventory. He had not gotten that far yet. He testified that "something was amiss". He suspected something "fishy" such as contraband, guns, drugs, or hazardous materials. Murin also testified that he did not think that he needed probable cause to search the boxes when he put on thin rubber gloves, removed a box, and opened it with a knife to inspect its contents. Inside the box was a package wrapped in opaque brown plastic with a "Metro" label on it. Murin cut the bag open and saw a white crystalline powder. Murin then went inside the port of entry building, advised Escano and Brito of their *Miranda* rights, and called the Mesa County Narcotics Team.

Shortly thereafter, Mesa County Sheriff's Department Detective Steven Stogsdill (Stogsdill), who is a member of the Mesa County Narcotics Enforcement Team, and Detective Timothy Grimsby (Grimsby), of the Grand Junction Police Department arrived at the port of entry. Grimsby brought his narcotics detection dog, Duke. Stogsdill and Grimsby entered the trailer and showed Duke the boxes. Duke signaled positive for the presence of narcotics.

Stogsdill took custody of the plastic bag with the white powder that Murin found. Stogsdill took the white powder to Jerry Hill (Hill), laboratory technician for the Grand Junction Police Department. Hill performed chemical tests on the powder

and the results were positive for cocaine. The tractor-trailer was sealed, impounded, and driven by Edens to Grand Junction for inventory.

A search warrant for the tractor and trailer was obtained at about 5:00 p.m. At 6:00 p.m., Stogsdill searched the tractor-trailer pursuant to the search warrant. 474 kilograms of cocaine were seized from the trailer.

The tractor was titled in the name of Jose Abreu, 503 W. 174th Street, New York, New York. On the outside of both doors of the tractor is the name "J. Abreu Transport, Union City, New Jersey."

Seized from the cab of the tractor was: 1) a Motor Vehicle Services registration card which lists the license plate T388FL, used on the 1979 Dorsey trailer, as belonging to a 1984 Dorsey trailer registered to Two Brothers Transportation (Two Brothers) at 400 38th Street, Union City, N.J. 07087; 2) a registration for another trailer (plate No. T352FL, 1982 Dorsey), also registered to Abreu at 400 38th Street, Union City, N.J.; 3) an insurance card bearing Abreu's name, which was crossed out and handwritten in its place was the name Two Brothers, 400 38th Street, Union City, N.J.; 4) a Colorado Department of Revenue permit dated September 3, 1989, authorizing the tractor-trailer, with an empty weight of 35,000 pounds, to enter the State of Colorado and be driven to the State of Utah, bearing Abreu's name at the address 400 38th Street, Union City, N.J.; 5) motor vehicle and fuel registration, identification and licensing card for the 1985 tractor registered to Abreu; 6) a driver's daily log book in the names of Brito and J. Abreu Transport; 7) a Nebraska proration and fuel permit issued on September 3, 1989; 8) a trip permit issued by the Arizona Department of Transportation of September 7, 1989 and; 9) several cash receipts which show fuel, maintenance and equipment purchases in the name of J. Abreu Transport.

The 1979 Dorsey trailer with a VIN number 138186 is owned by Eduardo Schaper (Schaper) of Omaha, Nebraska. The owner of the license plate T388FL is Two Brothers. Although Abreu claims that Two

Brothers' place of business is 400 38th Street, Union City, N.J. and a September 15, 1989 DEA–6 report prepared by Special Agent Guillen states that Abreu is Two Brothers' owner, the New Jersey Secretary of State reports that Two Brothers does not exist in New Jersey or New York. An Interstate Commerce Commission search for Two Brothers and Abreu Trucking revealed an application and approval form for Abreu Trucking but none for Two Brothers.

DEA agent Michael Meyrick (Meyrick) also went to the address listed for Two Brothers and Abreu's mailing address, 400 38th St., Union City, N.J. Neither Two Brothers nor Abreu maintains an office at that address. However, Mr. Pedrera (Pedrera), Abreu's accountant, was present at the suite listed as Abreu's mailing address. Pedrera told Meyrick that although he knows Abreu and J. Abreu Trucking, he has never heard of or received mail addressed to Two Brothers. Rather, the evidence shows that Two Brothers is a Nebraska corporation, located at 14001 N Street, Omaha, Nebraska. The Schaper is Two Brothers' president, Rueben Vivares is its vice president and treasurer, Barbara Salager is a vice president, and Tom Andreas is its secretary. Abreu is not an officer, director, shareholder, or employee of Two Brothers.

Abreu contends that he purchased the trailer from Vivares. However, there is no satisfying evidence that he did so. I find as fact that Abreu has no right, title, or interest in the trailer. Nor does he have any ownership interest in, or employment or agency relationship with, any entity or person that does.

Abreu had no possessory interest in the trailer apart from his involvement in the transportation of the cocaine. The evidence shows that Abreu and J. Abreu Trucking employed and directed Escano and Brito to drive to Riverside, California, to pick up cocaine from "Papo", and to bring it back to New York.

Escano and Brito bought the load locks that secured the cargo at the Ontario, California truck stop where they were to meet

Papo. Their fingerprints were found on the load locks and Brito's fingerprints were found on one of the sealed cartons containing the narcotics.

When Abreu was arrested by DEA agents on September 9, 1989, at 4:30 a.m. in his apartment, 503 W. 174th Street, New York, New York, he told agents that he was involved with the transportation of the cocaine seized in Colorado. At the time of his arrest, agents seized from Abreu's residence various documents including telephone bills that show calls placed from Abreu's phone number to Papo's phone numbers and documents bearing Escano's and Brito's names. Moreover, Escano identified two telephone numbers as Papo's listed as "Brother" and "El Brother" from his address book. When Abreu was arrested, the officers also seized keys to a mailbox located in Colorado which were given to Abreu by members of a cocaine trafficking organization. The mailbox and the keys were related to the attempted delivery of the cocaine.

DEA agents searched the mailbox and found, among other things: 1) a Colorado State permit for a 1985 Kenworth tractor registered to Abreu; 2) a speeding ticket issued to Alexander Abreu in Ohio, who had a New Jersey driver's license and was driving a 1985 Kenworth tractor-trailer registered to Felipe Mazola; 3) two Colorado certificates of title for trailers registered to Luis Felipe Mazola; and 4) a copy of the application for the mailbox in the name of Felipe Mazola, signed Luis Mazola. The mailbox was rented to Luis Felipe Mazola on behalf of Mazola Transport.

Mazola lives in Riverside, California, and matches the physical description of Papo. There was no evidence tying Mazola to Two Brothers, Schaper, or Vivares. Nor was there any evidence that Mazola had any possessory interest in the Dorsey trailer.

On September 8 and 9, 1989 Meyrick interviewed Escano three times. In the last interview, at approximately 1:00 a.m. on September 9, 1989, Escano told Meyrick that he knew he was transporting cocaine and that he was doing so under Abreu's direction. Thereafter, Escano agreed to place a tape-recorded telephone call to Abreu in New York. Escano determined to a substantial degree the dialogue for his call.

That same day, Magistrate Jill Clifton of the United States District Court for the District of Colorado in Grand Junction, Colorado, issued an arrest warrant for Abreu's arrest. At approximately 4:30 a.m., three New York DEA agents, Steven D'Erchia (D'Erchia), Edward Guillen (Guillen), and Brian Conneely (Conneely), were outside Abreu's apartment door at 503 W. 174th St., Apt. 4, New York City, New York, when they heard the telephone in Abreu's apartment ring. DEA special agent John Falvey (Falvey), who was in radio contact with Colorado authorities, advised the three agents outside Abreu's apartment that the telephone call between Escano and Abreu had occurred. On that signal, Guillen knocked on the apartment door and identified the officers as DEA agents. Falvey secured the rear of the building.

Abreu's girlfriend, Angelina Chavez, opened the door and told the agents to come into the apartment. The agents were dressed in blue jeans, blue rain jackets with the DEA seal, and bullet proof vests. D'Erchia and Guillen were armed with drawn and ready sub-machine guns. Conneely was armed with a 9mm automatic handgun. Abreu was talking on the telephone in the hallway. Conneely made a quick security sweep of the apartment while Guillen, who speaks Spanish, approached Abreu, and asked him to identify himself. D'Erchia frisked and handcuffed Abreu. On Abreu was a set of car keys and another key. Guillen then arrested Abreu, and advised him of his *Miranda* rights from his DEA *Miranda* card in Spanish and in English and Abreu responded affirmatively that he understood. D'Erchia and Guillen testified credibly that Abreu was speaking English, and that he did not request an attorney or an "abrogado".

Two other women, Abreu's mother and sister, also were present in the apartment.

Conneely told the women to sit down on the living room couch. He then asked them to identify themselves and he wrote down their names. Their conversation was in English.

Guillen advised Abreu in English of the reason for his arrest. Guillen then asked Abreu if the agents could search the apartment. The agents did not use a written consent to search form and none of them told Abrue that he could refuse consent to search. D'Ershia testified credibly that when Guillen asked if they could search Abreu's apartment, Abreu said yes. Guillen told Abreu that they were interested specifically in any guns, money, or drugs that Abrue might have. Abreu said that he knew, that he would show them and "there were no problems here, I'm one of you." Abreu lead Guillen and Conneely into his mother's bedroom and pointed with his head towards the closet. On top of the closet, Guillen and Conneely found a loaded .45 automatic pistol. On the closet floor, they found two blue duffle bags. The duffle bags were filled with about $130,000 cash and various documents. The agents also seized a mobile phone.

The agents searched the two bedrooms and the living room area, looked in the bureau drawers and seized papers that were located on a telephone stand by the bedroom and in a briefcase. The agents also searched the women's purses. The entire search lasted from 30 to 45 minutes.

Conneely and D'Erchia took Abreu downstairs. Abreu indicated that a white Nissan Pathfinder double-parked on the street outside the apartment building belonged to his son. Guillen asked Abreu if he could search the car and Abreu said yes. Abreu gave Guillen the security code to open the car. Guillen searched the car and seized money and the battery to the mobile phone found in Abreu's apartment.

D'Erchia and Conneely took Abreu to the 18th floor of Manhattan DEA headquarters for processing. D'Erchia again advised Abreu, in English, of his *Miranda* rights. During processing, the agents took a mailbox key from Abreu. Abreu told the agents that the key was to the Colorado post office box. He said he did not know what was in the box but he knew that it belonged to people who hired him. Abreu indicated to the agents that he was willing to cooperate but that he feared for his life and for his family's safety.

D'Erchia called Guillen, who was at his desk on the 19th floor counting the money seized from Abreu's apartment. D'Erchia then took Abreu to the agents' office on the 19th floor. All four agents were present and handling various paperwork. Guillen tried to illicit Abreu's cooperation. He and Abreu periodically engaged in conversation during an hour-and-a-half period of time.

Abreu admitted responsibility for the load of cocaine and told the agents that he could provide information regarding other dealings involving Abreu Trucking and regarding the people in Colorado who were acting under his direction. Abreu wanted to go to Colorado to assist his nephew who had been arrested. He was concerned for his nephew's safety. He indicated that he was being paid $200 per kilo to ship cocaine from California to New York, but he did not indicate for whom he was shipping the narcotics. Abreu said that he was paid half of the money in advance and that other half would be paid upon delivery.

The agents testified credibly that Abreu never asked for an attorney and never indicated to them that he wanted to end the questioning. He was asked whether he wanted to make a telephone call but he declined.

Abreu was taken before a Magistrate in the Southern District of New York at about 8:30 a.m. September 9. The advisement took place at about 9:30 or 10:00 a.m.

## II. Conclusions of Law.

### A. Standing.

Fourth Amendment rights are personal; they may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). A criminal defendant's right to challenge a search and seizure as being violative of the fourth amendment is premised upon the existence of a reasonable

expectation of privacy in the place searched or the items seized. *Id.* at 140, 142–43, 99 S.Ct. at 428, 429–30; *United States v. Salvucci*, 448 U.S. 83, 93, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980). A person cannot complain about an illegal search and seizure of damaging evidence secured by a search of a third person's property because there is no infringement of any of his or her Fourth Amendment rights. *Rakas v. Illinois, supra* 439 U.S. at 134, 99 S.Ct. at 425; *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980). In assessing a defendant's expectations of privacy, a court looks to the totality of the circumstances. *See, e.g., Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). The burden of persuasion on this issue is on the movant. *Rakas v. Illinois, supra* 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1; *Rawlings v. Kentucky, supra* 448 U.S. at 104–105, 100 S.Ct. at 2561–62. Possession of narcotics is illegitimate, and ownership or possession of contraband seized does not alone confer standing. *Rawlings v. Kentucky*, 448 U.S. 98, 105–106, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *United States v. Jacobsen*, 466 U.S. 109, 123, 104 S.Ct. 1652, 1661, 80 L.Ed.2d 85 (1984). Hence, Abreu must establish a reasonable expectation of privacy in the trailer searched.

■ The two-part standing test used to determine whether a defendant's expectation of privacy is reasonable is: 1) whether the defendant has shown a subjective expectation of privacy in the area searched, and 2) whether the defendant's subjective expectation of privacy is one that society is prepared to recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). For Fourth Amendment purposes, "a legitimate expectation of privacy means more than a subjective expectation of keeping incriminating evidence hidden." *United States v. McHugh*, 769 F.2d 860, 864 (1st Cir.1985).

A defendant satisfies the first prong of the test by showing facts "sufficient to create the impression that his or her relationship with the location was personal in nature; was more than sporadic, irregular, or inconsequential; and that the defendant maintained the location and the items within it in a private manner at the time of the search." *U.S. v. Gerena*, 662 F.Supp. 1218, 1235 (D.Conn.1987). The second prong is more exacting. *Hudson v. Palmer*, 468 U.S. 517, 525 n. 7, 104 S.Ct. 3194, 3199 n. 7, 82 L.Ed.2d 393 (1984). It depends largely on close analysis of the facts and circumstances surrounding the defendant's particular subjective claim. *United States v. Salvucci*, 448 U.S. at 91–93, 100 S.Ct. at 2552–54. The question of subjective interest and objective reasonableness necessarily overlap and it is impossible to divorce entirely inquiry under one prong of the test from inquiry under the other. *U.S. v. Gerena, supra* at 1235 n. 19. Thus, if analysis of the totality of the circumstances reveals a substantial similarity in quality between a given subjective expectation and those traditionally recognized as legitimate, then, in the absence of circumstances to the contrary, a court may properly conclude that the individual possesses standing with regard to the location and its contents. *Hudson v. Palmer*, 468 U.S. at 525–26, 104 S.Ct. at 3199–3200.

■ Property ownership is one factor to consider in determining whether a defendant has a reasonable expectation of privacy. *United States v. Cassity*, 720 F.2d 451, 456 (6th Cir.1983). Other factors include the nature of the place searched, *see Rakas v. Illinois*, 439 U.S. at 153–54, 99 S.Ct. at 437–36; *Arkansas v. Sanders*, 442 U.S. 753, 761, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979), whether the defendant had a possessory interest in the thing seized or the place searched, whether the defendant had a right to exclude others from that place, whether the defendant exhibited a subjective expectation that the place would remain free from governmental intrusion, whether the defendant took precautions to maintain privacy, and whether the defendant was legitimately on or in possession of the premises searched. *Id.; United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir.1981).

■ Although I have found that Abreu has no legitimate right, title, or other interest in the trailer, he contends that the existence of a joint venture with Vivares, Schaper, and Two Brothers to transport cocaine in the trailer establishes his expectation of privacy in the trailer and its cargo, and thus, he has standing to contest the search of the trailer and the seizure of its contents. To support this assertion he relies on the Ninth Circuit's "joint venture" line of cases. *See United States v. Quinn*, 751 F.2d 980, 981 (9th Cir.1984), *cert. dismissed as improvidently granted*, 475 U.S. 791, 106 S.Ct. 1623, 89 L.Ed.2d 803 (1986); *United States v. Pollock*, 726 F.2d 1456, 1465 (9th Cir.1984); *United States v. Johns*, 707 F.2d 1093, 1099 (9th Cir.1983), *rev'd* on other grounds, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985).

■ The joint venture theory has been rejected by a number of courts. *See U.S. v. Gerena*, 662 F.Supp. 1218, 1244–1249 and cases cited therein. The Tenth Circuit has implicitly rejected the joint venture theory of standing. *See United States v. Obregon*, 748 F.2d 1371 (10th Cir.1984); *United States v. Erickson*, 732 F.2d 788 (10th Cir.1984); *see also United States v. Musson*, 650 F.Supp. 525, 530 (D.Colo.1986) (Matsch, J.). I decline to adopt it here because the joint venture theory does nothing more than confer standing on the mere basis of status as a criminal conspirator. *See U.S. v. Gerena, supra* at 1245. Further, the Ninth Circuit's cases are distinguishable because Abreu had no ownership or possessory interest in the trailer, he had no interest in any entity that might have had such interest, and he had no relationship with any person or entity who owned or possessed the trailer. *See United States v. Quinn, supra* at 981. Assuming, nevertheless, a joint venture with or among Schaper, Vivares, or Two Brothers to transport cocaine, such relationship would be but one nondispositive factor to be considered otherwise under the totality of circumstances. *U.S. v. Gerena, supra.*

Abreu took steps to preserve as private both the trailer and its contents. However, the totality of the circumstances do not demonstrate that he possessed the subjective, significant, personal privacy interest in the trailer necessary to satisfy the first prong of the test. Abreu owned the tractor but Schaper owned the trailer and Two Brothers owned the license plates. Although his agents, Escano and Brito, were in possession of the trailer and transporting contraband at Abreu's direction, there is no evidence that Abreu was authorized by Schaper or any other person or entity to possess or use the trailer on this or any other occasion. While there is some evidence that Abreu was acquainted with Vivares and Schaper, there is no evidence that Abreu exercised joint supervision and control of the trailer with either or that they entered into a joint venture to transport cocaine or any other legitimate cargo.

The trailer was padlocked, the boxes, each bearing a U–Haul label, were taped and hidden beneath stacked wooden pallets, and the packets inside each box were wrapped in brown plastic paper. This effort to secret the contraband, alone, is insufficient to show that Abreu was personally aggrieved by the search of the trailer and seizure of the contraband or that any of his Fourth Amendment rights were violated. *See Rakas v. Illinois, supra* 439 U.S. at 134, 99 S.Ct. at 425. Each factor that Abreu relies on to establish standing flows not from any legitimate source but only from the criminal conspiracy.

Reviewing the quality and object of Abreu's particular subjective expectation, he also has failed to satisfy the second prong of the test. The totality of the circumstances leads me to conclude that Abreu's expectation of privacy in the trailer is not one that society would recognize as reasonable. Abreu has failed to show that his professed interest in the trailer is of a quality similar in nature to legitimate expectations of privacy one would normally have with regard to his or her home and its contents. Abreu has shown no more than that the alleged joint venture attempted to conceal its drug transport activities.

■ While a trailer is capable of harboring a reasonable expectation of privacy, one has a diminished expectation of privacy

in it. *New York v. Class*, 475 U.S. 106, 111–113, 106 S.Ct. 960, 964–65, 89 L.Ed.2d 81 (1986); *Arkansas v. Sanders*, 442 U.S. 753, 761, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979). Moreover, one's expectation of privacy in commercial property is less than one's privacy expectation in a home. *New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636, 2646, 96 L.Ed.2d 601 (1987). This expectation is further attenuated for highly regulated business premises. *Id; But see U.S. v. Leary*, 846 F.2d 592, 596–97 (10th Cir.1988).

The interstate trucking industry is closely regulated and the provisions regulating commercial vehicles are extensive. The rules and regulations relate to safety, drivers' qualifications, motor vehicles' parts and accessories, notification and reporting of accidents, drivers' hours of services, inspection, repair and maintenance of motor vehicles, and transportation of hazardous materials. 49 C.F.R. Parts 100–399. The public interest in regulating the interstate trucking industry is stated in the "Statement of Basis and Purpose" established by the Colorado Department of Public Safety in its adoption of "Rules and Regulations concerning Minimum Standards for the Operation of Commercial Vehicles and Transportation of Hazardous Materials":

> Rules governing the safety standards for the transportation of hazardous materials on Colorado highways and for commercial vehicles traveling Colorado highways are critical for the protection of the public health, safety, and welfare of all who may use those highways. Accidents involving commercial vehicles are for the most part devastating due to the size of the vehicles and the loads they carry. Prior to 1985, statistics show a gradual yearly increase of commercial vehicle accidents and related injuries and fatalities. Since 1985, commercial vehicle accidents have dropped by 14% and the related fatalities by 4%. As accident rates continue to decline, so do the hazardous material incidents that are related to highway transportation.

On September 16, 1985, the Director of the Department of Public Safety adopted rules regarding minimum standards for the operation of commercial vehicles and transportation of hazardous material which became effective on October 30, 1985. These rules were amended by the Director of the Department of Public Safety on June 2, 1988, effective July 30, 1988.

Pursuant to 17 C.R.S. § 42–4–234(3) (L. '85), Colorado adopted the safety and hazardous materials regulations in effect in 1987 of the United States Department of Transportation's Hazardous Materials and Motor Carrier Safety Regulations set forth in 49 C.F.R., Parts 100 through 399. Similar objectives are stated at 49 U.S.C.App. §§ 2501 and 2502, and 49 C.F.R. § 177.800 and § 350.7.

The regulations inform interstate carriers and operators that inspections will be made at fixed weigh and check stations. The regulations include the requirements that drivers must be 21 years old, have a currently valid commercial motor vehicle operator's license, and a medical examiner's certificate that he is physically qualified to drive. 49 C.F.R. Ch. III, §§ 391.-11(a)(b) and 391.41(a). The North American Uniform Out-of-Service Criteria (the Criteria), dated February 15, 1989, provides that when a driver is not at least 21 years old or is not licensed to operate the class and type of vehicle being operated, the enforcement officer is to remove the driver and preclude further operation of the vehicle.

All owners and operators of motor vehicles subject to the payment of fees or taxes which have not been certified properly by the PUC or which have not been approved by the Department of Revenue for monthly or periodic payment, must be issued a clearance certificate from a Department of Revenue officer, from an officer of the Colorado State Patrol, or from a port of entry weigh station, C.R.S. § 42–8–105(1); 42–8–106(2), before travel is permitted on Colorado highways. C.R.S. § 42–8–105. A clearance certificate is issued only after fees, licenses, or taxes which may be due are paid or compliance is had with regulatory acts. C.R.S. § 42–8–106.

"The Colorado State Patrol is authorized to enforce or aid in enforcing all state laws pertaining to motor vehicles including their equipment, weight, cargoes, licenses, drivers, and inspection certificates." C.R.S. § 24–33.5–203. They may inspect, examine, investigate, impound, or hold any vehicle for violation of Colorado laws. C.R.S. § 24–33.5–212(1)(a)(III). Moreover, they may require the operator of any commercial vehicle to stop, exhibit required documents, and "submit to a *complete inspection of* such vehicle and the equipment, *interior, cargo*, license plates ... when there is *reasonable cause* to believe that the vehicle is being operated in violation of any [Colorado] law ... regulating the operation of vehicles or use of the highways...." C.R.S. § 24–33.5–212(1)(b) (emphasis added).

Here, the drivers were under age. They were not in possession of valid driver's licenses, medical certificates, or the trailer's registration. The tractor did not have a current vehicle safety inspection sticker. The trailer had no pro-rata plate, contained undisclosed freight, and was tagged with a license plate registered to yet another vehicle and owner.

Under the totality of the circumstances, I conclude that Abreu had no reasonable expectation of privacy in the trailer. Accordingly, I hold that Abreu has not demonstrated standing to contest the legal sufficiency of the search and seizure of the trailer at the Loma, Colorado port of entry.

### B. Derivative Evidence.

Because Abreu has no standing to contest the search and seizure of the trailer, his argument that evidence derived therefrom is tainted as "fruit of the poisonous tree," *see Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), is without merit.

### C. The Tape–Recorded Conversation between Abreu and Escano.

During the early morning hours of September 9, 1989, Escano, who was in custody in Grand Junction, Colorado, agreed to place a recorded telephone call to Abreu at his New York apartment. Abreu contends that the telephone conversation was: 1)

recorded in violation of his Sixth Amendment right to counsel; 2) obtained through unlawful custodial interrogation in violation of *Miranda* and the Fifth Amendment; and 3) electronically intercepted in violation of 18 U.S.C. § 2510 *et seq.* Specifically, Abreu argues that although he had not been formally charged, formal adversary judicial proceedings had been initiated against him and "he was effectively imprisoned at the time police placed the telephone call...." *Edwards v. Arizona*, 451 U.S. 477, 480–81 n. 7, 101 S.Ct. 1880, 1883 n. 7, 68 L.Ed.2d 378 (1980) Abreu's contentions are without merit.

■ A defendant's Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). Because Abreu had not been arrested when the recorded telephone conversation occurred, his Sixth Amendment right to counsel was not violated.

■ Moreover, a defendant's Fifth Amendment right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), attaches only when a suspect invokes that right during custodial interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). Here, Abreu was neither in custody nor subject to interrogation when the telephone conversation with Escano occurred. Rather, he was in his own apartment, unaware that agents were outside his door.

■ 18 U.S.C. § 2511(2)(c) provides:
It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Abreu contends that Escano's consent was not voluntary.

 To establish consent, it will normally suffice to show that a party engaged in a conversation with the knowledge that it was being recorded. *United States v. Fuentes*, 563 F.2d 527, 533 (2nd Cir.1977). This showing is less stringent than that required to show consent for a physical search, and may consist of circumstantial, rather than direct, evidence. *Id.*

Escano exercised independent and rational choice. *See United States v. Skipworth*, 697 F.2d 281, 283 (1983). He agreed to cooperate with the agents and agreed to place a tape-recorded telephone call to Abreu. Escano determined substantially what he would say to Abreu, and placed the call in Meyrick's presence, knowing that the conversation was being recorded. Accordingly, I conclude that the evidence supports an inference of consent.

### D. Warrantless Search of Abreu's New York Apartment.

 Abreu contends that the search of his New York apartment was conducted without consent, without the benefit of a search warrant, and exceeded the scope of an authorized search pursuant to an arrest warrant. I disagree.

To establish consent, the government must show by clear and convincing evidence that the defendant, either expressly or impliedly, voluntarily waived his Fourth Amendment rights. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A valid waiver may be found notwithstanding the fact that the defendant is in custody and is not advised of his right to refuse. *United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). Validity is determined by the totality of the circumstances. *Id.* 412 U.S. at 226–27, 93 S.Ct. at 2047–48.

Here, when police entered Abreu's apartment Guillen immediately advised Abreu of his Miranda rights in English and Spanish and Abreu responded affirmatively in English that he understood. Although Abreu's primary language is Spanish, he has been in the United States for approximately 17 years and speaks English. Abreu is a businessman and owner of Abreu Trucking, an interstate trucking enterprise. Abreu testified that he was advised of his rights at the time of his arrest but that he knew what his rights were before he was arrested.

After Abreu was arrested and read his Miranda rights, Guillen asked if they could search the apartment. Although they did not obtain Abreu's written consent, or advise him of his right to refuse consent, Abreu voluntarily agreed to the search. The agents told Abreu that they were interested primarily in any guns, money, or drugs. Abreu showed them where those items were located.

The record does not disclose any credible evidence that the Abreu's consent was coerced or made under duress. Rather, based upon the totality of the circumstances, I conclude that the evidence clearly and convincingly demonstrates that Abreu's consent to search was freely and voluntarily given and that the search did not exceed the scope of the consent.

### E. Abreu's Post–Arrest Statements.

Defendant seeks to suppress all post-arrest statements made by him to federal agents. Defendant contends that the statements were the result of: 1) denial of his Sixth Amendment right to counsel; 2) denial of his Fifth Amendment privilege against self-incrimination; and 3) failure to take him before a magistrate in violation of Fed.R.Crim.P. 5(a).

 A defendant's post-arrest statements are admissible where the government establishes, by a preponderance of the evidence, a voluntary, knowing, and intelligent waiver of his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 525, 93 L.Ed.2d 473 (1986). Once a valid waiver is made, questioning may continue until the arrestee invokes his *Miranda* rights or changed circumstances indicate that his responses are no longer voluntary. The validity of a waiver is determined from the totality of the circumstances. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986).

Here, when Abreu was arrested, Guillen advised him of his *Miranda* rights in English and Spanish. At Manhattan DEA headquarters, Abreu was advised again, in English, of his *Miranda* rights. Abreu was intermittently questioned in the agents' large, open office on the 19th floor, and he selectively answered the agents' questions. Abreu never asked for an attorney and never indicated to the agents that he wanted to end the questioning. I therefore conclude that defendant made a voluntary, knowing, and intelligent waiver of his rights.

Furthermore, any delay in taking Abreu before a magistrate was not unreasonable. Fed.R.Crim.P. 5(a) requires that an arrestee be taken before a magistrate without unnecessary delay. The rule does not bar the government from questioning an arrestee prior to being taken before a magistrate. *Hayes v. United States*, 419 F.2d 1364, 1367–1368 (10th Cir.1969).

Here, Abreu was in the DEA agents' custody from approximately 4:30 a.m. on Saturday, September 9, 1989, until he was transferred to the courthouse for his initial appearance at approximately 8:30 a.m. that same day. I conclude that the agents' actions were not unreasonable and that Abreu's post-arrest statements are admissible at trial.

### F. The Nissan Pathfinder.

On September 9, 1989, the Nissan Pathfinder was seized from the street outside defendant's New York apartment where it was double parked. The vehicle was retained in DEA's custody in New York City before it was ordered administratively forfeited pursuant to and in compliance with 19 U.S.C. § 1600 *et seq.*, in December 1989.

Fed.R.Crim.P. 41(e) provides that a motion for return of property is filed in the district court for the district in which the property was seized upon a colorable claim of ownership of property that was illegally seized. Accordingly, this Court does not have jurisdiction to entertain Abreu's motion for return of the forfeited Nissan Pathfinder.

Accordingly, IT IS ORDERED that:

1. Defendant's motion to suppress evidence seized at the Loma, Colorado port of entry is DENIED.

2. Defendant's motion to suppress the tape-recorded conversation between himself and Escano is DENIED.

3. Defendant's motion to suppress evidence obtained in the search of his New York apartment is DENIED.

4. Defendant's motion to suppress his post-arrest statements is DENIED.

5. Defendant's request for return of the Nissan Pathfinder is DENIED.