**UNITED STATES of America, Plaintiff,**

v.

**Eulalio Vazquez GRANADOS, Defendant.**

**No. 93–40033–02–SAC.**

United States District Court,
D. Kansas.

Jan. 14, 1994.

Gregory G. Hough, Topeka, KS, for U.S.

Marilyn M. Trubey, Asst. Federal Public Defender, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant Granados' motion to suppress (Dk. 25) statements he made on August 30, 1993, to Trooper Mike Keesling of the Kansas Highway Patrol. The court heard other pre-trial motions in this case on November 15, 1993, and continued this motion to suppress as there was an outstanding bench warrant for Granados' arrest. The warrant has been executed and the defendant has been returned to this district. On January 6, 1994, the court heard argument and received evidence on Granados' motion to suppress.

On August 30, 1993, Trooper Keesling was called to the scene of a single vehicle accident on the eastbound entry ramp of the east Topeka interchange on the Kansas Turnpike. The accident involved a vehicle which had struck a light pole along the entrance ramp and then had flipped over. When he arrived, Trooper Keesling observed a Ford Ranger pickup laying over on the driver side and the defendant Granados standing up through the passenger door.

Granados was taken by ambulance to Stormont–Vail hospital for treatment of his injuries from the accident. Granados had a deep laceration of his left temple and a severe laceration across the palm of his left hand. Trooper Keesling followed the ambulance to the hospital and then escorted the defendant into the trauma room. During breaks in the defendant's medical examination and treatment, Trooper Keesling advised the defendant of his *Miranda* rights and received the defendant's verbal waiver of those rights. Whenever medical personnel examined or treated the defendant, Trooper Keesling would step aside and not resume questions until there was another break in the treatment. Trooper Keesling spoke only English to the defendant while giving the *Miranda* warning and putting questions to him. The defendant answered in English; and his answers were appropriate and responsive. Trooper Keesling did not observe Granados to be under the influence of alcohol or drugs, to have a mental disease or defect, or to be suffering from intolerable pain. There is no evidence that Trooper Keesling promised, induced, threatened or coerced the defendant.

Officers investigating the accident found scattered on the ground and hidden in compartments in the pickup approximately 168 duct-taped packages. The defendant Granados, who was allegedly driving the vehicle when the accident occurred, and the defendant Antonio Ramos, who was allegedly a passenger in the pickup when the accident occurred, were indicted for one count of conspiracy to possess marihuana with the intent to distribute it, 21 U.S.C. § 846, and one count of possession of marihuana with the intent to distribute it, 21 U.S.C. § 841(a)(1).

The defendant pursues several grounds for suppressing his statements. First, the defendant did not make a knowing waiver because of an insufficient understanding of English. Second, the defendant invoked his rights by refusing to sign a written waiver. Third, the defendant did not voluntarily

waive his rights because "he was suffering from a great deal of pain." (Dk. 25 at 4). Fourth, Trooper Keesling used coercive tactics in just interrogating the defendant while he was in the hospital being treated for serious physical injuries.

In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." For purposes of *Miranda,* interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980).

■ A suspect who has been informed of his Miranda rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. The burden rests with the government to prove a valid waiver by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986); *U.S. v. Amos,* 984 F.2d 1067, 1074 (10th Cir.1993). A court may find a proper waiver "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986).[1] In considering whether the confession or statement is one of free will, the courts look to several factors, including: the age, education, and intelligence of the defendant; the length of detention and questioning; whether Miranda warnings were given; the defendant's physi-

cal and mental characteristics; and the location of the questioning. *U.S. v. Chalan,* 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *see U.S. v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). "In no case, however, is any single factor determinative." *Chalan,* 812 F.2d at 1307. Once the defendant validly waives his Miranda rights, interrogation may continue until the defendant invokes his rights or changed circumstances suggest the responses have become involuntary. *U.S. v. Abreu,* 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd,* 935 F.2d 1130 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991).

In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez,* 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barret,* 479 U.S. 523, 530, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987) (quoting *Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985)).

■ Language barriers are a factor to consider, because they may impair a suspect's ability to act knowingly and intelligently. *United States v. Heredia–Fernandez,* 756 F.2d 1412, 1415 (9th Cir.), *cert. denied,* 474 U.S. 836, 106 S.Ct. 110, 88 L.Ed.2d 90 (1985); *see Hernandez,* 913 F.2d at 1510. Language is not a stumbling block when the suspect is advised of his rights also in a language that he ostensibly understands.

---

1. A court must satisfy itself of two things before finding a valid waiver of Miranda rights:

    "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.

    Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."
    *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986).

See, e.g., *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir.1987). It becomes a more difficult problem when the *Miranda* rights are given in English only. In these instances, the courts consider what effort the officer made to communicate, whether the defendant responded that he understood his rights or ever indicated that he did not understand them, and what the defendant displayed in English language skills.

For example, in *United States v. Bernard S.*, 795 F.2d 749 (9th Cir.1986), the defendant's native language was Apache and his English language skills were deficient to the point that an interpreter had been used during trial. In finding that the defendant had knowingly waived his rights, the Ninth Circuit emphasized that the officer had explained the rights and had asked the defendant if he understood them and that the defendant had responded that he did and had never indicated that he did not understand his rights. 795 F.2d at 752.

Another example is *Campaneria v. Reid*, 891 F.2d 1014 (2nd Cir.1989), *cert. denied*, 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991), where the Second Circuit found that the defendant had a limited proficiency in the English language but had displayed in a recorded interview a sufficient command of it to have understood the *Miranda* warnings read to him. In a similar vein, the First Circuit in *United States v. Abou–Saada*, 785 F.2d 1, 10 (1st Cir.1986), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986), rejected the defendant's argument that the very fact he was provided an interpreter shows an inadequate knowledge of the English language. The court instead looked to a number of circumstances showing the defendant's ability to understand and use the English language, such as his answers to the interrogating officers which included a detailed medical description of a complicated neck injury. *Id.*

In contrast, the Sixth Circuit found an English only Miranda warning insufficient where the defendant was a West German national, who had resided in the United States only three months, could not drive, had no friends in the United States other than her husband, and spoke only broken English. *United States v. Short*, 790 F.2d 464, 469 (6th Cir.1986). The court looked to several other factors in reaching this conclusion. The defendant was not familiar with the American criminal justice system. A social services officer present during the interrogation testified that she questioned whether the defendant understood the implications of the answers and that she thought the defendant appeared ignorant and evidenced judgment limitations. The Magistrate Judge appointed an interpreter for her at trial. The defendant's written statement contained language that obviously was not hers, and the statement appeared, at best, to be the agent's interpretation of her halting English. 790 F.2d at 469.

■ In this case, Trooper Keesling read the defendant the Miranda warning in English only but took special care to communicate in simple and direct language and to discern if the defendant understood what the officer was saying. The tape recording and the transcript of the interrogation establish this:

Trooper: ... I'm Trooper Keesling with the Kansas Highway Patrol and I've got a few questions for you.

Defendant: Uh huh.

Trooper: Before I ask you any questions though, because you are under suspicion for narcotic trafficking I'm going to advise you of your Miranda rights. Do understand the Miranda?

Defendant: For what?

Trooper: For hauling drugs. There were drugs in that car. I'm going to advise you of your rights. You have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot hire a lawyer, the court will appoint one for you. Do you understand each of those rights?

Defendant: I ... I can talk ... what ... you asked me some question and I came to tell you....

Trooper: I'm going to ask you some questions....

Defendant: Ok.

Trooper: But I want to make sure you understand you have the right not to answer those questions if you don't want to.

Defendant: Ok, if I don't understand I'm telling you.

Trooper: Pardon?

Defendant: If I don't understand what you say, I'll tell you.

Trooper: Well, I want to make sure you understood what I just said. You understand you don't have the right, you have the right to not answer any questions if you don't want to. You understand you can tell me no, I don't want to talk to you.

Defendant: Ok. Yes.

Trooper: Ok. You understand that?

Defendant: Yeah.

Trooper: And you understand that if you want to you can have a lawyer in here to stand on your side while we're talking.

Defendant: Yes, Ok.

Trooper: Ok.

Defendant: I want to talk.

Trooper: Ok. You do want to talk to me now?

Defendant: Yeah.

Trooper: Ok.

Defendant: Why not?

As this shows, the Trooper Keesling diligently worked at communicating the *Miranda* rights to the defendant. Trooper Keesling separately asked the defendant if he understood his rights and the defendant affirmatively responded that he did. The defendant never told Trooper Keesling that he did not understand the rights as given to him.

The defendant's answers to Trooper Keesling revealed sufficient English skills for the court to infer that the defendant understood the *Miranda* warning. The defendant answered the questions in English telling the Trooper about his visit to his mom and dad in Parral, Chihuahua, Mexico, where he currently lives and works, how he came to be in the pickup, what his legal status in the United States was, what route the defendants took from El Paso to Topeka and their intended destinations, and how the accident occurred. In the medical records from the defendant's stay at Stormont–Vail hospital, there are several entries about the staff's impression that the defendant speaks and understands English "fairly well." A nurses' note made about the time of the interrogation states: "Pt. cooperative. Converses with Highway patrol. Dr. Peterson exams pt. Pt. is Spanish speaking understands *most* very well."

The fact that the Magistrate Judge appointed an interpreter for the defendant Granados and the defendant Ramos is not controlling of the issue. The current record does not show if the defendants asked for an interpreter or what facts or evidence was considered by the Magistrate Judge in his decision to appoint one. By statute, a presiding judicial officer must use a certified appointer when the party or witness speaks only or primarily a another language besides English "so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony." 28 U.S.C. § 1827(d)(1). Comparing the complexity and breadth of what is typically done and said in the courtroom with what is involved in the *Miranda* warning, limited English skills may suffice to understand the latter but not former. For that matter, judges are more likely to err on the side of caution when it comes to deciding if an interpreter is necessary. Even though it entirely agrees with the Magistrate Judge that an interpreter is needed for the defendant Granados in these proceedings, the district court finds from the recording and transcript that Granados understood the *Miranda* warnings given to him.

■ The defendant next notes that there is no written waiver of rights and that the Ninth Circuit has found in certain circumstances that a refusal to sign a written waiver is the same as invoking *Miranda* rights. *See, e.g., United States v. Heldt*, 745 F.2d 1275, 1278 (9th Cir.1984). What the defendant fails to acknowledge is that other circumstances are critical in deciding the effect of the refusal and that "[t]he Courts of Appeals have unanimously rejected the ... argument that refusal to sign a written waiver

form precludes a finding of waiver." *North Carolina v. Butler,* 441 U.S. 369, 375 n. 5, 99 S.Ct. 1755, 1758 n. 5, 60 L.Ed.2d 286 (1979) (citations omitted). Trooper Keesling did not offer a written waiver form to the defendant. Consequently, there was no refusal, and there is no basis for the court to infer that the defendant invoked his *Miranda* rights. The defendant expressly waived his rights and said he wanted to talk with the officer.[2]

In arguing that his statement was involuntary, the defendant singles out the fact that because of cuts to his head and hand he was in pain and being treated at the hospital when Trooper Keesling advised him of his *Miranda* rights and proceeded to question him. "[A] defendant can voluntarily waive his *Miranda* rights even when he is in the hospital, on medication, and in pain." *United States v. George,* 987 F.2d 1428, 1430 (9th Cir.1993) (citing *United States v. Lewis,* 833 F.2d 1380, 1384–85 (9th Cir.1987) ("holding statement voluntary despite fact that defendant had recently returned from surgery on her shoulder, was in pain, and had recently received a general anesthetic"); *United States v. Martin* 781 F.2d 671, 673–74 (9th Cir.1985) ("holding statements voluntary even though · defendant under influence of Demerol, a pain killer, and still ·in pain")).

In *Mincey v. Arizona,* the Supreme Court held that the defendant's "will was simply overborne" under some extreme circumstances. 437 U.S. 385, 401–02, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978). Mincey had sustained a gunshot wound to his hip damaging the sciatic nerve and causing partial paralysis of his right leg. The police interrogated Mincey while he was in intensive care and hooked up to tubes which prevented him from speaking. *Id.* at 396, 98 S.Ct. at 2415.

Mincey could only answer the officer's questions in writing, and some of them were "not entirely coherent." 437 U.S. at 399, 98 S.Ct. at 2417. Mincey complained that his pain was unbearable. Mincey asked repeatedly for the interrogation to stop as he wanted an attorney present. 437 U.S. at 399–400, 98 S.Ct. at 2417–18. The interrogation continued for four hours until almost midnight. The officer periodically would stop asking questions when Mincey lost consciousness or received medical treatment and then would ·resume the questions. 437 U.S. at 401, 98 S.Ct. at 2418. Such extreme circumstances are not present here.

■ As recounted above, the defendant said he understood his *Miranda* rights and agreed to answer Trooper Keesling's questions. The defendant gave rational, coherent, and responsive answers to the questions asked. His memory was intact as shown by his ability to recall interstate highway numbers, phone numbers, and motel room numbers. The medical records described the defendant on his arrival at the trauma room as conscious, coherent, cooperative and conversant. Trooper Keesling observed that the defendant remained conscious and appeared mentally alert throughout the interrogation. The defendant never complained that his pain was so great as to prevent him from answering the officer's questions. The medical records do not show that the defendant was administered any serious pain medication for his injuries prior to the interrogation.

■ A defendant's mental condition does not by itself determine the issue of voluntariness. *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). "[W]hile mental condition is surely

---

**2.** The Supreme Court in *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979), set forth the general rules on waiver:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of the waiver, but is not inevitably either necessary or sufficient to establish waiver. · The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda

case. As unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated. (footnote omitted).

relevant to an individual's susceptibility to police coercion," the police must still overreach and exploit the known and existing condition. *Id.* at 165, 107 S.Ct. at 520. There is nothing to suggest that Trooper Keesling was exploiting the defendant's condition. The questions were simple and direct, the questioning lasted less than thirty minutes, and the defendant never asked for the officer to stop. Trooper Keesling's conduct and questions were not coercive or overbearing. In short, the evidence shows that Trooper Keesling did not promise, induce, threaten or coerce the defendant and that the defendant's discomfort and pain was not so severe as to render him unable to make a voluntary statement or unduly susceptible to manipulation.

IT IS THEREFORE ORDERED that the defendant Granados' motion to suppress (Dk. 25) is denied.