UNITED STATES of America, Plaintiff,

v.

Edgar Artemio SANCHEZ, Defendant.

No. 94–40031–01–SAC.

United States District Court,
D. Kansas.

Oct. 14, 1994.

Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, for defendant.

Thomas G. Luedke, Office of U.S. Atty., Topeka, KS, for plaintiff.

## MEMORANDUM AND ORDER

CROW, District Judge.

On June 15, 1994, the grand jury returned a one count indictment charging the defendant, Edgar Artemio Sanchez, with knowing and intentional possession with the intent to distribute approximately one hundred kilograms of a mixture or substance containing a detectable amount of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2.

On May 5, 1994, Sanchez, while traveling alone in a rented van, was stopped by Trooper Weigel for driving 71 m.p.h., 6 m.p.h. over the posted speed limit on I–70. Sanchez is a native of Guatemala but has lived in the United States since 1969. Spanish is his first language. After issuing Sanchez a warning for speeding, Trooper Weigel asked Sanchez for permission to search Sanchez' vehicle.

Sanchez consented to the search of the van. During his thorough search of the van, Trooper Weigel discovered what he believed to be cocaine. Sanchez was placed under arrest and given the *Miranda* warnings. Based upon questions posited by Trooper Weigel, Sanchez made certain incriminating statements at the scene of the arrest. After his arrest, Sanchez was interviewed on two separate occasions by law enforcement officers. Prior to each interview, Sanchez was given the *Miranda* warning in both Spanish and English. During each interrogation, Sanchez made incriminating statements.

This case comes before the court upon the following pretrial motions filed by the defendant:

1. Motion for discovery (Dk. 23).

2. Motion to suppress evidence seized from van (Dk. 27); Memorandum in support of motion to suppress evidence seized from van (Dk. 28); Memorandum of law on issue of consent.

3. Motion to suppress statements of accused (Dk. 25); Memorandum of law in support of motion to suppress statements of accused (Dk. 26).

4. Motion to preserve dispatch tapes (Dk. 24).

5. Motion to dismiss indictment due to violation of 18 U.S.C. § 3161 and Rule 4(b) of the Federal Rules of Criminal Procedure (Dk. 30).

6. Motion for production of witnesses pursuant to Rule 17(b) of the Federal Rules of Criminal Procedure (Dk. 33).[1]

The government has filed a response (Dk. 31) and the defendant has filed a reply to that response (Dk. 32). The government has filed a surreply (Dk. 34).

On August 30–31, 1994, the court conducted a hearing on these motions. The defendant's request for sequestration of witnesses was granted. At that hearing, following the government's presentation of evidence, and the defendant's presentation of his own testimony and the testimony of his daughter, the defendant requested a continuance to acquire time to locate and obtain a witness who would testify to the effect that the mile markers used by Trooper Weigel to time Sanchez' vehicle [2] are not accurate measurements of the distance between two points on the road, but are instead merely reference points spaced *approximately* one mile apart. Over the government's objection, the court continued the hearing until September 13, 1994, to permit the defendant the opportunity to obtain such a witness.

On September 13, 1994, the defendant attempted to call Cindy G. McNorton, investigator for the Federal Public Defender's Office, as a witness to testify concerning her understanding of the significance of the mile markers and to introduce photographs which she had taken of the area where Sanchez was stopped. The court precluded McNorton from testifying based upon the invocation of the rule of sequestration. Nevertheless, the court admitted a report prepared by McNorton concerning her investigation. The court also permitted the introduction of eleven photographs [3] taken by McNorton of the area where Sanchez was stopped.

On September 27, 1994, Sanchez filed a motion for rehearing, or in the alternative, that the court view the scene of the traffic stop that is the subject of this case (Dk. 39).

---

1. This motion is denied as moot.

2. While stopped beside the road with another vehicle, Trooper Weigel observed the defendant pass him at a rate of speed Trooper Weigel believed, based upon his training and experience, to be in excess of 65 m.p.h. Trooper Weigel got into his own vehicle, pursued the defendant's vehicle, and determined the defendant's speed through the use of a stopwatch and the use of mile markers. Trooper Weigel used this manner of determining the defendant's rate of speed based upon the fact that the radar gun in his vehicle could not gauge the speed of a vehicle traveling directly ahead of his vehicle. Trooper Weigel indicated that he has used a stop watch extensively in the monitoring traffic.

3. The court notes that comments were written on the back of each of the photographs. Unfortunately, the ink used to write on the back of the photographs has bled on to other photographs. While immaterial to the disposition of the motions presented here, in the future the court would request that the parties mark each exhibit in a manner that will not adversely affect other exhibits.

In that motion, the defendant argues that the court erred in not permitting McNorton to testify. In support of that motion, the defendant proffers the testimony of McNorton relevant to each of the photos. Defendant's counsel argues that he was unaware of the need to call McNorton until after hearing Trooper Weigel's testimony, and therefore it would be unfair and too harsh a penalty under the circumstances to exclude McNorton's testimony. Defendant's counsel argues that McNorton's testimony was only to rebut Trooper Weigel's testimony, and therefore she should not be disqualified from testifying.

The government opposes the defendant's motion for rehearing on several grounds. Specifically, the government argues that the defendant's own lack of preparation and lack of foresight has caused his current predicament and that such circumstances do not justify granting the defendant's request for yet another opportunity to present his evidence. The government argues that the defendant apparently knew or should have known before the August 30–31, 1994, hearing that the distances between or the visibility of the mile markers were potential issues in this case. "It is disingenuous for defense counsel to claim that they had no information concerning the mile markers prior to Trooper Weigel's testimony on August 30." The government argues, citing other cases in which the Federal Public Defender appeared in which this same issue has arisen, that this is merely another attempt "to subvert sequestration orders that they themselves requested." The government also argues that the information the defendant intends to introduce is either irrelevant or cumulative to the evidence already admitted.

 The court denies the defendant's request for rehearing. Nor has the court accepted the defendant's invitation to view the scene of the stop on I–70 in person. The court believes that the exclusion of McNorton as a witness was correct under Fed. R.Evid. 615, and in any event, the court has considered the photographs taken by McNorton and her report in deciding the pending motions. McNorton's testimony would therefore largely be cumulative to the evidence admitted. Moreover, even if the de-

fendant were in some way prejudiced, that prejudice was caused solely by the defendant's lack of foresight. Nothing prevented the defendant from acquiring another witness who was not present at the August 30–31, 1994, hearing, to testify regarding the distance between mile markers. Nor should the defendant's counsel have been surprised by this court's application and interpretation of Rule 615, as this court has consistently applied the rule in the same manner in the past.

Fed.R.Evid. 615 provides:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

"The efficacy of excluding or sequestering witnesses has long been recognized as a means of discouraging and exposing fabrication, inaccuracy, and collusion." Notes of Advisory Committee on 1972 Proposed Rules (citing 6 Wigmore §§ 1837–1838). The need for a sanction, and the nature of one, if imposable, for violation of Fed.R.Evid. 615 is committed to the trial court's sound discretion. *United States v. Sepulveda,* 15 F.3d 1161, 1177 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).

The court, having considered the arguments of the parties, denies Sanchez' motion for rehearing (Dk. 39).

The court, having considered the evidence presented, the briefs and arguments of counsel, and the applicable law, is now prepared to rule.

### 1. Motion for discovery (Dk. 23).

Sanchez has filed a motion for discovery under Fed.R.Crim.P. 16 and *Brady.* The defendant separately numbers his request into thirteen separate paragraphs.

In response, the government argues that the defendant's requests should be denied summarily for non-compliance with this court's procedural guidelines. The government notes that the defendant does not state that he cannot reach an agreement with the government regarding the requested information. Nor, according to the government's brief, has the defendant availed himself of the opportunity to inspect the materials in the government's possession. The government then proceeds to respond to each of the defendant's specific requests.

In his reply brief, the defendant argues that, *inter alia,* the government's counsel's absence for two weeks made it impossible for him to comply with this court's procedural guidelines. It appears from the defendant's reply brief that the parties have agreed to or settled most of the issues. The defendant has apparently narrowed the focus of his request to the following:

1. According to the defendant's brief, the parties have agreed to submit, for in camera review, if the court is willing, Trooper Weigel's personnel file; and

2. The materials requested in paragraph 10, which states:

Copy of logs maintained by the Kansas Highway Patrol of requests made by them for information from the following databanks: National Crime Information Center (NCIC); El Paso Information Center (EPIC); and, Interstate Identification Index (III). In addition, the accused requests all manuals, whether denominated as training manuals, instructional manuals, standard operating procedure manuals, directives, policies or guidelines utilized by the Kansas Highway Patrol in requesting information from the above databanks.

The government opposes this request as seeking irrelevant material, as overbroad and as burdensome.

■ The court is unwilling to review the personnel files of Trooper Weigel, based upon the court's conclusion that the defendant has made an insufficient showing to demonstrate that such information is relevant to the issues presented by this case.

■ In regard to the defendant's request in paragraph 10, the court is not persuaded that the defendant has made any showing that he is entitled to such information. In *United States v. Fernandez,* 18 F.3d 874 (10th Cir.1994), the defendant was apparently provided statistical information concerning the issuance of warning tickets for tinted windows by one officer in comparison to the other officers in his unit. From this simple fact, Sanchez argues that he is entitled to all of the information in paragraph 10. As the government suggests, the defendant's motion is overbroad. Although the defendant's discovery request in *Fernandez* may have been granted, it appears that such a request would have been decidedly narrower than the Sanchez' request in this case. Nor has the defendant made a sufficient showing that such information is relevant to his defense. The defendant's request for material's found in paragraph number 10 is denied.

2. **Motion to suppress evidence seized from van (Dk. 27); Memorandum in support of motion to suppress evidence seized from van (Dk. 28); Memorandum of law on issue of consent.**

Sanchez contends that the initial stop of his vehicle was without probable cause. Sanchez contends that he was driving 64 m.p.h., one mile an hour under the posted speed limit. Therefore the initial stop of his vehicle was without legal justification.

Sanchez next contends that even if the court concludes that the initial stop of the vehicle was legally justified, the stop was nevertheless pretextual. Sanchez argues that speeding six miles over the limit, for which Sanchez was only issued a warning ticket, was pretextual. Sanchez argues that he was stopped not because he was speeding, but instead because he was driving a rental van from out of state and because he is Hispanic.

Sanchez argues that even if the initial stop of his vehicle was legally justified, he was unreasonably detained by a "barrage of questions" from Trooper Weigel. Sanchez argues that because Trooper Weigel cannot articulate any legitimate reasons to substantiate his apparent belief that criminal activity was

afoot, it is clear that he was unlawfully detained.

Next, Sanchez argues that his subsequent consent to search his van is tainted as fruit of the poisonous tree. Specifically, Sanchez contends that because of the Fourth Amendment violations, his subsequent consent to search the vehicle was not voluntary. Sanchez argues that the alleged consent "followed immediately on the heels of the Fourth Amendment violation." Sanchez argues that Trooper Weigel's aggressive questioning, coupled with Sanchez' limited understanding of English demonstrate that his consent to search was not voluntary.[4] Sanchez also argues that the Trooper Weigel exceeded the scope of the consent to search.

The government has responded, contending that the initial stop was not pretextual, that the defendant voluntarily consented to the search of the vehicle, and that Trooper Weigel did not exceed the scope of the consent to search that was given.

Analytically, the defendant's motion can be broken-down into the following framework:

1. Did Trooper Weigel have sufficient facts to warrant stopping Sanchez' vehicle? If there was no legitimate reason to stop the vehicle, the search should be suppressed unless the defendant's consent to search was voluntary.[5]

2. If Trooper Weigel had a legal justification for stopping Sanchez' vehicle for speeding, was the stop nevertheless pretextual? If the stop was pretextual, the search should be suppressed unless the defendant's consent to search was voluntary.

3. If the stop was not pretextual, was Sanchez nevertheless unreasonably detained?

4. If the stop and detention were reasonable under the Fourth Amendment, was Sanchez' consent to search voluntary?

5. Even if Sanchez' consent to search was voluntary, did Trooper Weigel exceed the scope of the consent to search?

The court will consider each of these issues seriatim.

### Legal Standards

### Was the initial stop of Sanchez' vehicle pretextual?

"The Fourth Amendment protects against *unreasonable* search and seizures." *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991). "The stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the means of the Fourth Amendment. An ordinary traffic stop is a limited seizure, however, and is more like an investigative detention than a custodial arrest." *United States v. Walker*, 933 F.2d 812, 815 (10th Cir.), *reh'g denied*, 941 F.2d 1086 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). *See United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.) ("A traffic stop is an investigative detention analogous to a *Terry* –stop.") (citing *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994)).

"The Fourth Amendment requires that police have an articulable and reasonable suspicion of criminal conduct before making an investigative stop of an automobile." *United States v. Arzaga*, 9 F.3d 91, 93 (10th Cir.1993). The reasonableness of the stop "is evaluated in two respects: first, whether the officer's action was justified at

---

4. In a separate memorandum, the defendant challenges the voluntariness of the consent to search irrespective of whether the stop and detention violated the Fourth Amendment.

5. "The government bears the burden of proving the voluntariness of consent, (citation omitted) and that burden is heavier when consent is given after an illegal stop." *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir.1994). The government must establish that the defendant's consent to search "'is sufficiently an act of free will to purge the primary taint of the illegal [seizure], [or] it must be suppressed as fruit of the poisonous tree.'" *Id.* (quoting *United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir.1989)). "When examining the totality of the circumstances, no single fact is dispositive but three factors are especially significant: 'the temporal proximity of the illegal stop and the consent, any intervening circumstances, and the purpose and flagrancy of [the official] misconduct.'" *Id.* (quoting *United States v. Guzman*, 864 F.2d 1512, 1520, 1521 (10th Cir.1988)).

its inception, and second, whether the action was reasonably related in scope to the circumstances that first justified the interference." *Gonzalez–Lerma*, 14 F.3d at 1483 (citing *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968)).

"In contrast to a lawful investigative stop, '[a] pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop.'" *Arzaga*, 9 F.3d at 93 (quoting *United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988)).[6] "A traffic stop cannot be used as a pretext to search for narcotics." *United States v. Quinones–Sandoval*, 943 F.2d 771, 774 (7th Cir.1991) (citations omitted). "To determine whether an investigative detention is unconstitutional as a pretext we ask ' " 'not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose.' " '" *Fernandez*, 18 F.3d at 876 (quoting *Guzman*, 864 F.2d at 1517) (quoting *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986)).[7] The evaluation of whether the stop was lawful is based upon an objective analysis "and not an inquiry into the officer's subjective intent." *United States v. Lyons*, 7 F.3d 973, 975 (10th Cir.1993) (citing *Guzman*, 864 F.2d at 1515).

### Was Sanchez unreasonably detained?

In *United States v. Sanchez–Valderuten*, 11 F.3d 985 (10th Cir.1993), the Tenth Circuit summarized the law concerning the issue of whether a person is unreasonably detained during a traffic stop:

> "During a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation." *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993) (citations omitted). " 'If the driver produces a valid license and proof of right to operate the vehicle, the officer must allow him to continue on his way without delay for further questioning.' " *Id.* (quoting *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990), *cert. denied*, [501 U.S. 1207] 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991)). If the officer detains the driver for further questions unrelated to the stop he must have an "objectively reasonable articulable suspicion" of illegal activity. *Soto*, 988 F.2d at 1554. The assessment of reasonable suspicion is based on the " 'totality of the circumstances.' " *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)); *Soto*, 988 F.2d at 1555.

11 F.3d at 989.

In *Sanchez–Valderuten*, the defendant argued that the detention that followed the stop of his vehicle was unreasonable. The Tenth Circuit rejected his claim that the detention was unreasonable:

> the primary reason for [the trooper's] stop was to determine whether the defendant was driving while impaired by alcohol or lack of sleep. (citations omitted). If the evidence supports such a reason, the stop cannot have been pretextual because it would have been grounded upon the officer's duty to protect the driving public from the danger of an impaired motorist." 7 F.3d at 975.

The Tenth Circuit held that because the trooper could not articulate a reason for his belief that the driver was impaired, the officer was relying upon his "sixth sense" or a hunch. "Such reliance is not the stuff of objective responsibility." 7 F.3d at 976. The court of appeals also noted that weaving within a lane is not a crime and that it is common for people to avoid making eye contact with police officers while driving.

---

**6.** In *Guzman*, the Tenth Circuit found that the officer's stop was pretextual where "[n]o objective circumstances suggested [defendants] had committed any crime more serious than failure to wear their seatbelts." 864 F.2d at 1519.

**7.** In *United States v. Lyons*, 7 F.3d 973 (10th Cir.1993), a trooper stopped a vehicle because it had "weaved" three or four times within its lane of the divided highway. When the trooper pulled next to the driver, the driver refused to make eye contact. The trooper stopped the vehicle based upon his suspicion that the driver was impaired. After stopping the vehicle, the trooper noticed the odor of marijuana.

On appeal, the defendant argued that the stop was pretextual. The Tenth Circuit stated that the "issue we must resolve initially, then, is whether

The magistrate judge found that Deputy Barney smelled coffee and air freshener at the time he requested defendant's license and registration. Barney, an experienced law enforcement officer trained in drug interdiction, testified that this combination is "known to be used by drug transporters to cover the smell of a controlled substance." App. E at 11–12. Based on the smell, the "unlikely" route, and defendant's evasion of Barney's questions concerning his point of departure, the magistrate found there was reasonable suspicion to believe defendant was transporting drugs.

We have upheld findings of reasonable suspicion in somewhat similar circumstances. *See, e.g., Pena,* 920 F.2d at 1514 (car registered in one state, driver's license from another, and trunk lock of vehicle was punched out); *United States v. Stone,* 866 F.2d 359, 362 (10th Cir.1989) (car smelled of masking odor; driver was suspected of involvement in drug smuggling). Based on the circumstances in the instant case, we uphold the district court's determination that the detention for further questioning was based on reasonable suspicion.

*Id.*

### Was Sanchez' consent to search voluntary?

■ " 'To admit evidence obtained in a consent search, the district court must find from the totality of the circumstances that (1) the defendant's consent to an officer's search was voluntary and (2) the search did not exceed the scope of the defendant's consent.' " *United States v. Cody,* 7 F.3d 1523, 1526 (10th Cir.1993) (quoting *United States v. Price,* 925 F.2d 1268, 1270 (10th Cir.1991) (citation omitted)).

### Consensual Searches

■ Under the Fourth and Fourteenth Amendments a search conducted without a warrant issued upon probable cause is *per se* unreasonable, subject only to a few specifically established and well-delineated exceptions. *Schneckloth v. Busta-*

*monte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). A search authorized by consent is wholly valid and is a well-recognized exception to the prohibition against warrantless searches. 412 U.S. at 219, 93 S.Ct. at 2043–44. Voluntariness is a question of fact to be determined from the totality of all the circumstances. 412 U.S. at 227, 93 S.Ct. at 2048. The government has the burden of proving the voluntariness of the consent. 412 U.S. at 222, 93 S.Ct. at 2045; *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993) ("The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue."). The government "must demonstrate with 'clear and positive testimony that consent was 'unequivocal and specific' and 'freely and intelligently' given.' " *United States v. Dewitt,* 946 F.2d 1497, 1500 (10th Cir.1991) (quoting *United States v. Abbott,* 546 F.2d 883, 885 (10th Cir.1977), *cert. denied sub nom.,* —— U.S. ——, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992)). The government must also prove that the consent was given without duress or coercion, express or implied. *Id.*

■ The Tenth Circuit has recently commented on the two-step inquiry necessary to determine whether the government has sustained its burden of showing that the consent to search was voluntary.

> To admit evidence obtained from a search, wherein consent was given, the following must be found:
>
> (1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and
>
> (2) The government must prove consent was given without duress or coercion, express or implied.

*United States v. Butler,* 966 F.2d 559, 562 (10th Cir.1992) (citing *United States v. Price,* 925 F.2d 1268, 1270–71 (10th Cir.1991)). "When making this determination, the court should not presume that the consent was either voluntary or involuntary." *Soto,* 988 F.2d at 1557.[8]

8. In *Price,* the Tenth Circuit held that the presumption against voluntary waiver of constitutional rights does not apply in consent to search cases. 925 F.2d at 1270. Prior to its decision in *Price,* the Tenth Circuit had included a "presumption against waiver" as part of the test for

**Did the search exceed the scope of the consensual search?**

 "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect.?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297, 302 (1991).[9] "The scope of a search is generally defined by its expressed object." 500 U.S. at 251, 111 S.Ct. at 1804, 114 L.Ed.2d at 303; *see United States v. Rudolph,* 970 F.2d 467, 468 (8th Cir.1992) ("A consensual search may not exceed the scope of the consent given."), *cert. denied,* —— U.S. ——, 113 S.Ct. 1023, 122 L.Ed.2d 169 (1993). "Whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir.1986).

Recently, the Tenth Circuit had occasion to consider the scope of a consent to search a vehicle:

While a person giving consent to a search may limit the area to be searched, a general consent to search includes closed containers within the vehicle, *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), and this court has specifically ruled that a failure to object to the continuation of a search indicates that the search was conducted within the scope of the consent given. *See U.S. v. Nicholson,* 17 F.3d 1294 (10th Cir.1994); *United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir.1986).

In *Nicholson,* the patrolman found a spare tire that was not mounted on a rim in the camper portion of a truck and noted that there was no spare tire or spare tire carriage located underneath the back of the truck. When the officer looked at the under-carriage of the truck, he found it had been freshly painted, and markings on bolts indicated they had recently been removed. We found that the search of the entire truck, including the undercarriage, was reasonable under the circumstances of that case.

*United States v. Santurio,* 29 F.3d 550, 553 (10th Cir.1994); *see United States v. Deases,* 918 F.2d 118, 122 (10th Cir.1990) ("Consent to search a car means to search the entire car and whatever is in it, unless such consent is otherwise restricted.") (citation omitted), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991); *see also United States v. Langston,* 970 F.2d 692, 699 (10th Cir.) (defendant gave officer unconditional consent to search trunk; therefore search not beyond scope of search), *cert. denied sub nom.,* —— U.S. ——, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992).

**Factual Findings**

 Based upon these legal standards, and having considered the evidence presented, the court concludes that the initial stop of Sanchez' vehicle was lawful. The court rejects Sanchez' contention that the stop of vehicle was pretextual. Trooper Weigel, an experienced trooper, testified that Sanchez' vehicle was traveling at approximately 71 m.p.h., and that it is the policy of the Kansas Highway Patrol to stop persons so violating the 65 m.p.h. speed limit. *See Sanchez–Valderuten,* 11 F.3d at 989, n. 3; *United States v. Deases,* 918 F.2d at 120–122 (stop of vehicles by Kansas Highway Patrolman for vehicle traveling five to six miles over speed limit not pretextual). Despite Sanchez' testimony that he did not believe that he was driving in excess of 65 m.p.h.,[10] the court

---

determining the voluntariness of a consensual search.

**9.** In *Jimeno,* a police officer saw a folded, brown paper bag on the floor-board. The officer picked up the bag, opened it, and found a kilogram of cocaine. 500 U.S. at 250, 111 S.Ct. at 1803, 114 L.Ed.2d at 302. The Supreme Court held that it was objectively reasonable for the police to conclude that the suspect's general consent to search the car included consent to search containers within the car that might bear drugs.

**10.** In reaching this conclusion, the court has considered and essentially rejected the evidence presented by the defendant, including the testimony of his daughter, that he had a "habit" of driving slowly.

The court also concludes that even if the mile markers used by Weigel to determine Sanchez'

finds that the stop of his vehicle for speeding was lawful.

Sanchez also argues that because he was stopped by Trooper Weigel for the purpose of being issued a warning for speeding rather than for the issuance of an actual citation, that he was stopped for no reason at all, and therefore the stop was an impermissible violation of the Fourth Amendment. The defendant argues that stop was a legal nullity, and that the court's inquiry should essentially end. The court disagrees, concluding that the Tenth Circuit has essentially rejected that argument in *United States v. Harris*, 995 F.2d 1004 (10th Cir.1993).

In *Harris*, the defendant argued that the evidence demonstrated that Denver police would not have issued a written ticket for the parking violation, failure to signal and erratic driving the officers had observed, and therefore the stop of his vehicle leading to his arrest for possession of a firearm, and the search incident to his arrest revealing crack cocaine, would not have occurred. The Tenth Circuit rejected that argument:

> But whether the officers would normally issue formal written tickets for such conduct is immaterial. The pertinent issue is whether a reasonable officer would have made the stop for similar conduct, not whether the officer would have issued a formal citation or merely an informal warning.

995 F.2d at 1005. Sanchez' attempts to distinguish the holding of *Harris* are unavailing; *Harris* basically forecloses this avenue to the defendant.

■ As to the defendant's contention that he was unlawfully detained, viewed as a whole, the entirety of the stop was not unlawful. The facts known and observed by Trooper Weigel clearly justified a slightly extended stop, if the stop was actually so extended in duration.[11] Approximately thirteen minutes elapsed between the time of the stop and the time Trooper Weigel asked for permission to search the van.

Sanchez' rental van was traveling on I–70, a known drug trafficking route. Drugs are often transported in rental vehicles to avoid the impact of drug forfeiture laws. While standing outside the vehicle, Trooper Weigel detected a strong odor of coffee, a substance commonly used to mask the odor of marijuana. *See United States v. Lawson*, 999 F.2d 985, 986 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 574, 126 L.Ed.2d 473 (1993) (odor of coffee a common technique employed by narcotics traffickers to mask the odor of cocaine).

In addition, Trooper Weigel thought it seemed odd that Sanchez would spend $1,637.15 to rent the van in California to transport approximately $300 worth of furniture to Rhode Island. The rental fee was paid in cash. Trooper Weigel also knew that California was a source state of narcotics to the East Coast.

■ Having concluded that the initial stop of the vehicle was lawful, and having concluded that the defendant was not unreasonably detained, the court will now turn to the issue of whether the defendant voluntarily consented to the search of the van. Based upon the totality of the circumstances, the court concludes that Sanchez voluntarily consented to the search of the van. Prior to asking for permission to search the van, Trooper Weigel returned all of the paperwork, driver's license and immigration card. Sanchez then consented to the search of the van.

---

speed are not exactly one mile apart, this fact standing alone does not undermine the reasonableness of the stop. Nor is the court persuaded that Trooper Weigel's recount of the events is undermined by the photographs and report introduced by the defendant.

11. Trooper Weigel indicated that in all instances he attempts to develop some rapport with the driver who has been stopped. Trooper Weigel indicated that by doing this he is simply attempting to make persons who have been stopped feel more at ease, thereby improving the circumstances of an otherwise strained encounter.

Obviously, at some point a trooper's attempt to develop a better rapport would cross the line between a mere exchange of pleasantries to a violation of the suspect's Fourth Amendment rights. In this case, that line is not approached by Trooper Weigel's minimal conversations with Sanchez and minimal delay prior to asking for permission to search the van.

The defendant argues that based upon his limited understanding of English, coupled with his belief that he must obey the orders of a police officer and his interpretation of Trooper Weigel's request to search as an order, that his consent was not voluntary. Although English is not the defendant's first language, it is apparent from the evidence presented that the defendant has fundamental, albeit imperfect, command of the language. Sanchez generally responded appropriately to each of Trooper Weigel's questions. In short, the defendant's conduct during the stop, his long-time residence in the United States, and his apparent ability to conduct business transactions in English, belies his claim that he did not understand his conversation with Trooper Weigel. *See Sanchez–Valderuten,* 11 F.3d at 990–991.

In determining that Sanchez' consent was voluntary, the court has considered the fact that Trooper Weigel failed to inform Sanchez of his right to withhold his consent to search. However, "[w]hether a defendant is informed that he need not consent to a search is only one factor in determining whether consent was voluntary." *Sanchez–Valderuten,* 11 F.3d at 990. This factor, while weighing in Sanchez' favor, when considered against all of the facts and circumstances of the stop, is not controlling.

The court also concludes that Trooper Weigel's search of the van and its contents did not exceed the scope of the consent given. Sanchez consented to the search of the van, and that search was in no way limited by Sanchez. The court's conclusion that Sanchez' consent to search the van was voluntary and that the search was within the scope of his consent is buttressed by the fact that Sanchez stood by as the trooper searched the van and its contents. *See United States v. Lewis,* 24 F.3d 79, 81 (10th Cir.) (no contemporaneous objection to search of defendant's bag indicates that search did not exceed scope of search), *cert. denied,* — U.S. —, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994); *Sanchez–Valderuten,* 11 F.3d at 991 (defendant's conduct while search taking place indicates that he freely consented to a search of the vehicle); *United States v. Dewitt,* 946 F.2d 1497, 1501 (10th Cir.1991)

(failure to object to continuation of search indication that search was within scope of consent), *cert. denied,* — U.S. —, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992).

Sanchez' motion to suppress evidence seized from the van is denied.

**3. Motion to suppress statements of accused (Dk. 25); Memorandum of law in support of motion to suppress statements of accused (Dk. 26).**

The defendant apparently made certain incriminating statements at the time he was arrested, other statements approximately one hour later, and yet other statements approximately five hours later to the investigating officers. In his brief, the defendant bases his motion to suppress those statements on the following arguments:

(a) lack of understanding by Mr. Sanchez of the *Miranda* warning;

(b) invocation by Mr. Sanchez of a request to remain silent (ignored by Trooper Weigel);

(c) Trooper Weigel proceeding with interrogation without obtaining a waiver by Mr. Sanchez of his *Miranda* rights;

(d) a coercive atmosphere which rendered the statement involuntary;

(e) the statement as being a product of Fourth Amendment violations argued in other motions; and,

(f) that the statements were made in the course of negotiations in which Trooper Weigel has "apparent authority" to take part.

The government has responded, indicating that the defendant's fifth amendment rights were not violated.

### Legal Standards

In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." For purposes of

*Miranda*, interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

A suspect who has been informed of his Miranda rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. The burden rests with the government to prove a valid waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986); *U.S. v. Amos*, 984 F.2d 1067, 1074 (10th Cir.1993). A court may find a proper waiver "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).[12] In considering whether the confession or statement is one of free will, the courts look to several factors, including: the age, education, and intelligence of the defendant; the length of detention and questioning; whether *Miranda* warnings were given; the defendant's physical and mental characteristics; and the location of the questioning. *U.S. v. Chalan*, 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *see U.S. v. Short*, 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). "In no case, however, is any single factor determinative." *Chalan*, 812 F.2d at 1307. Once the defendant validly waives his Miranda rights, interrogation may continue until the defendant invokes his rights or changed circumstances suggest the responses have become involuntary. *U.S. v. Abreu*, 730 F.Supp. 1018, 1030 (D.Colo.1990),

*aff'd*, 935 F.2d 1130 (10th Cir.), *cert. denied*, 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991).

In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert. denied*, 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S.Ct. 828, 832–33, 93 L.Ed.2d 920 (1987) (quoting *Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985)).

Language barriers are a factor to consider, because they may impair a suspect's ability to act knowingly and intelligently. *United States v. Heredia–Fernandez*, 756 F.2d 1412, 1415 (9th Cir.), *cert. denied*, 474 U.S. 836, 106 S.Ct. 110, 88 L.Ed.2d 90 (1985); *see Hernandez*, 913 F.2d at 1510. Language is not a stumbling block when the suspect is advised of his rights also in a language that he ostensibly understands. *See, e.g., United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir.1987). It becomes a more difficult problem when the *Miranda* rights are given in English only. In these instances, the courts consider what effort the officer made to communicate, whether the defendant responded that he understood his rights or ever indicated that he did not understand them, and what the defendant displayed in English language skills.

This court recently addressed similar issues and arguments to those raised by San-

---

**12.** A court must satisfy itself of two things before finding a valid waiver of Miranda rights:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.

Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

chez in *United States v. Granados*, 846 F.Supp. 921 (D.Kan.1994). In *Granados*, the defendant sought an order suppressing statements he made to the Kansas Highway Patrol. Granados was interviewed by officers after the vehicle he was allegedly driving collided with a light pole. Officers at the accident scene found approximately 168 duct-taped packages containing marijuana scattered on the ground and hidden in compartments. The defendant argued, inter alia, that he did not knowingly waive his *Miranda* rights because of an insufficient understanding of English. The defendant also noted that the court had appointed an interpreter. The defendant also argued that the absence of a written waiver demonstrated that he had not waived his *Miranda* rights. Based upon the authorities cited above, the court found that the defendant had knowingly and voluntarily waived his *Miranda* rights.

### Promises of Leniency

In *United States v. Garot*, 801 F.2d 1241, 1244 (10th Cir.1986), relying on *Hunter v. Swenson*, 372 F.Supp. 287, 298 (W.D.Mo.), *aff'd*, 504 F.2d 1104 (8th Cir.1974), *cert. denied*, 420 U.S. 980, 95 S.Ct. 1410, 43 L.Ed.2d 662 (1975), the Tenth Circuit listed the following questions as relevant in addressing a claim that a confession was unconstitutionally coerced by a promise of leniency:

(1) Was an express or implied promise of lenience made to the defendant?

(2) If no promise of lenience was made, did the defendant reasonably believe that such a promise had been made?

(3) Was the defendant's statement induced by either the promise or his reasonable belief that a promise had been made?

(4) Was the inducive promise coercive?

*See Stohler v. Hargett*, No. 92–5040, 1993 WL 78782, 1993 U.S.App. LEXIS 5599 (10th Cir. March 18, 1993) (same).

For guidance on what constitutes coercion, the court looked to *United States v. Williams*, 447 F.Supp. 631, 636 (D.Del.1978), which rejected an inflexible per se rule that condemns any incriminating statement obtained as a result of promissory inducement. Instead, the court applied a totality of the circumstances test, which considers these non-exhaustive list of factors including whether:

(1) defendant is in custody at the time of the statement;

(2) defendant is alone and unrepresented by counsel;

(3) the promise or inducement is initiated by prosecuting officials as opposed to defendant or someone acting on his behalf;

(4) defendant is aware of his constitutional and other legal rights;

(5) the potentially incriminating statement is part of an abortive plea bargain;

(6) the promises or inducements leading to the statement are fulfilled by prosecuting authorities; and

(7) defendant is subjected to protracted interrogation or evidence appears on the record to show that coercion precludes the statement from being knowing and intelligent.

*Garot*, 801 F.2d at 1245 (citing *Williams*, 447 F.Supp. at 636–37).

### Analysis

The court concludes that the *Miranda* warnings given to the defendant were sufficient,[13] and that the defendant's statement "I can't say nothing" after Trooper Weigel's recitation of the *Miranda* warnings was an equivocal or ambiguous invocation of his right to remain silent, and therefore Trooper Weigel's continued questioning did not violate his right to remain silent, and that Sanchez' statements to the officers on the day of his arrest were the product of his knowing, intelligent waiver of his right to remain silent.

Although the defendant challenges the admissibility of all of the statements he made to law enforcement officers on May 5, 1994, the key to his motion to suppress hinges on the appropriateness of Trooper Weigel's initial questioning following Sanchez' arrest. The defendant argues that this improper interrogation essentially tainted all other statements made by Sanchez that day.

---

**13.** The defendant conceded this point during oral argument on the motion.

The issue of whether Trooper Weigel should have continued to interrogate Sanchez after the defendant stated "I can't say nothing," i.e., whether this statement was an invocation of the defendant's right to remain silent, must be analyzed in light of the Supreme Court's recent decision in *Davis v. United States*, —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). In *Davis*, Robert L. Davis was suspected of beating a sailor to death with a pool cue outside a club on the Charleston Naval Base. Based upon information collected, Davis was interviewed at the Naval Investigative Service. After being advised of his *Miranda* rights, Davis waived those rights both orally and in writing. About an hour and a half into the interview, Davis said "Maybe I should talk to a lawyer." The Supreme Court found that the defendant's statement was not an unambiguous request for counsel, and therefore the government agents were free to continue questioning the defendant. "If the suspect's statement is not an unambiguous request or unequivocal request for counsel, the officers have no obligation to stop questioning him." —— U.S. at ——, 114 S.Ct. at 2356, 129 L.Ed.2d at 373. Although it would have been entirely proper for the agents to ask questions clarifying the meaning of the defendant's statement, the Supreme Court declined to adopt a rule requiring officers to ask clarifying questions. —— U.S. at ——, 114 S.Ct. at 2356, 129 L.Ed.2d at 373.

In *Coleman v. Singletary*, 30 F.3d 1420 (11th Cir.1994), the Eleventh Circuit considered the issue of whether the defendant's statement "I don't know. But if he said to stop it I don't want to do what he said not to do." was an unequivocal invocation of his right to remain silent. The court of appeals discussed the impact and effect of the Supreme Court's decision in *Davis* on determining whether the defendant's Fifth Amendment rights had been violated.

Before the Supreme Court's recent decision in *Davis v. United States*, [——] U.S. [——], 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the rule in this Circuit was that: "When a defendant makes an equivocal request for an attorney during a custodial interrogation, 'the scope of that interrogation is immediately narrowed to one sub-ject and one only. Further questioning thereafter must be limited to clarifying that request until it is clarified.'" *Owen v. Alabama*, 849 F.2d 536, 539 (11th Cir.1988) (quoting *Thompson v. Wainwright*, 601 F.2d 768, 771 (5th Cir.1979) (emphasis in original)); accord [*U.S. v.*] *Mendoza–Cecelia*, 963 F.2d [1467] at 1472 [11th Cir.1992]. We applied the same rule to equivocal invocations of the right to cut off questioning: "Where an individual in custody makes an equivocal invocation of his right to remain silent, further questioning must be restricted to clarifying that request until it in fact is clarified, and no statement taken after the request but before the clarification can clear the *Miranda* hurdle." *United States v. Pena*, 897 F.2d 1075, 1081 (11th Cir.1990) (citing *Martin v. Wainwright*, 770 F.2d 918, 924 (11th Cir. 1985), *modified*, 781 F.2d 185 (11th Cir.), *cert. denied*, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986)); *accord United States v. Ramsey*, 992 F.2d 301, 305 (11th Cir. 1993).

However, our prior decisions must yield to supervening decisions of the Supreme Court. *E.g., Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1521 (11th Cir.1994) ("It is the law of this Circuit that we are bound by a prior panel's decision except to the extent it is altered by a supervening Supreme Court decision, which we will, of course, follow instead.") *Davis* is a supervening decision which changes our "clarification only" rule. In *Davis*, the Supreme Court held that, "although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." [——] U.S. at [——], 114 S.Ct. at 2355 (internal quote marks and citation omitted). "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at [——], 114 S.Ct. at 2356. Although recognizing that "it will often be good police practice for the interviewing officers to clarify whether or not he actual-

ly wants an attorney," the Court pointedly declined to adopt a rule requiring that officers ask clarifying questions. *Id.* "Unless the suspect actually requests an attorney, questioning may continue." *Id.*

Because we are bound to follow the Supreme Court's holding in *Davis,* our decisions creating a duty to clarify a suspect's intent upon an equivocal invocation of counsel are no longer good law. Furthermore, we have already recognized that the same rule should apply to a suspect's ambiguous or equivocal references to the right to cut off questioning as to the right to counsel. *Martin v. Wainwright,* 770 F.2d 918, 924 (11th Cir.1985) ("We see no reason to apply a different rule to equivocal invocations of the right to cut off questioning."), *modified on other grounds,* 781 F.2d 185 (11th Cir.), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986). The Supreme Court's concern in *Davis* was to craft "a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." [——] U.S. at [——], 114 S.Ct. at 2352. The Court rejected a rule requiring that police cease questioning a suspect after an ambiguous or equivocal invocation of his *Miranda* rights out of a fear that the "clarity and ease of application" of the bright line rule "would be lost." *Id.* Because this concern applies with equal force to the invocation of the right to remain silent, and because we have previously held that the same rule should apply in both contexts, we hold that the *Davis* rule applies to invocations of the right to remain silent. A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation.

We conclude, as did the magistrate judge and the district court judge, that Coleman's statement—"I don't know. But if he said to stop it I don't want to do what he said not to do."—is equivocal.

30 F.3d at 1423–1424.

Although it is a close call, the court concludes that Sanchez' statement "I can't say nothing" was ambiguous. Trooper Weigel interpreted that statement to essentially mean that the defendant could not say anything for fear of reprisal by his cohorts, rather than an invocation of his right to remain silent. This is a plausible interpretation of the statement under the circumstances. Therefore, Trooper Weigel's continued questioning was not violative of Sanchez' right to remain silent.

Nor were Sanchez' statements the product of the coercive tactics or promises of Trooper Weigel. *See Lewis,* 24 F.3d at 82. Similarly, Trooper Weigel did not offer a deal to Sanchez binding the United States government. The court is satisfied that Sanchez' statements to the police were the product of his knowing intelligent waiver of his right to remain silent. Sanchez' motion to suppress is denied.

**4. Motion to preserve dispatch tapes (Dk. 24).**

■■■ The defendant seeks an order compelling the government "to preserve until trial of the above-captioned case, any and all tape recordings of radio transmissions, dispatches and/or telephone calls in any way relating to the above-named defendant, who was the occupant of a vehicle stopped by law enforcement on May 5, 19994 on Interstate 70 at milepost 225 in Ellsworth, County, Kansas." The defendant indicates that such recordings are typically destroyed within thirty days and that he will be prejudiced if he is not allowed to review those tapes.

The government opposes the motion. First, the government opposes such "a shotgun approach to the use of the Court's power of compulsion." The government argues that the defendant, with a modicum of investigation could determine the custodian of those tapes, if they in fact exist. The government also argues that the defendant's request is overbroad.

As the government suggests, this request by the defendant is overbroad. The government is aware of its obligations under the Federal Rules of Criminal Procedure and under *Brady,* and there is nothing to demonstrate that the government has not fulfilled its obligations in this case. The defendant's request is denied.

**5. Motion to dismiss indictment due to violation of 18 U.S.C. § 3161 and Rule 4(b) of the Federal Rules of Criminal Procedure (Dk. 30).**

 Without benefit of any authority, the defendant argues that his right to a speedy trial has been violated. Essentially, the defendant contends that he was "parked" in the state system (facing basically identical state charges as the ones with which he is charged here), and therefore his statutory right to a speedy trial has been violated. The government opposes the motion, arguing that state arrest does not trigger the Speedy Trial Act's clock.

The government's analysis of this issue is correct. "Time spent in state custody on related state charges does not trigger the Speedy Trial Act's clock." *United States v. Occhipinti,* 998 F.2d 791, 796 n. 4 (10th Cir. 1993); *United States v. Mills,* 964 F.2d 1186, 1189–1190 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 471, 121 L.Ed.2d 378 (1992) ("[T]he undisputed rule [is] that a *state* arrest does not trigger the Speedy Trial Act's clock, even if the arrest is for conduct that is the basis of a subsequent indictment for a federal offense.") Similarly, "a defendant's Sixth Amendment rights [to a speedy trial] are not triggered by prior state arrest or indictment." *United States v. Allen,* 986 F.2d 1354, 1356 (10th Cir.1993).

The defendant's motion to dismiss the indictment is denied.

IT IS THEREFORE ORDERED that Sanchez' motion for rehearing (Dk. 39) is denied.

IT IS FURTHER ORDERED that Sanchez' motion to suppress evidence seized from van (Dk. 27) is denied.

IT IS FURTHER ORDERED that Sanchez' motion to suppress statements of accused (Dk. 25) is denied.

IT IS FURTHER ORDERED that Sanchez' motion to preserve dispatch tapes (Dk. 24) is denied.

IT IS FURTHER ORDERED that Sanchez' motion to dismiss indictment due to violation of 18 U.S.C. § 3161 and Rule 4(b) of the Federal Rules of Criminal Procedure (Dk. 30) is denied.

IT IS FURTHER ORDERED that Sanchez' motion for production of witnesses pursuant to Rule 17(b) of the Federal Rules of Criminal Procedure (Dk. 33) is denied as moot.